# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
November 18, 2014 Session

## STATE OF TENNESSEE v. PAUL JEROME JOHNSON, JR.

**Appeal from the Criminal Court for Knox County**
**No. 90518      Jon Kerry Blackwood, Judge**

---

### No. E2013-02437-CCA-R3-CD - Filed April 6, 2015

---

The defendant, Paul Jerome Johnson, Jr., was convicted of felony murder in perpetration of aggravated child abuse and aggravated child abuse, a Class A felony. He received concurrent sentences of life imprisonment for the felony murder conviction and nineteen years for the aggravated child abuse conviction. On appeal, he contends that the trial court erred by (1) admitting photographs of the victim from the hospital and the autopsy because the photographs had little probative value and were not relevant to material issues at trial; (2) improperly restricting the cross-examination of a witness; and (3) failing to require the State to make an election of offenses. After reviewing the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Mark Stephens, District Public Defender, Knoxville, Tennessee, for the appellant, Paul Jerome Johnson, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall Nichols, District Attorney General; and Charme P. Allen and Joanie Stewart, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS AND PROCEDURAL HISTORY

This case arose after the eighteen-month-old victim was admitted to East Tennessee Children's Hospital and later passed away due to his injuries. The victim's mother, Aja McBayne, testified that the victim was born on January 14, 2007, and that he did not suffer from any health problems. She met the defendant while both were attending Pellissippi State Community College, and they became friends. This friendship progressed briefly to a sexual relationship. After the sexual relationship "tapered off," the relationship returned to a friendship. In July of 2008, the sexual relationship was over, and the two "h[u]ng out" as friends. The defendant would occasionally "hang out" at the victim's mother's residence, and he would provide her with transportation when she needed rides.

In July of 2008, the victim's mother's apartment complex discovered that she had been convicted of a felony, and they gave her ten days to vacate the premises. At the time of the incident, she still had access to her apartment and was in the process of moving. She was convicted of conspiracy to counterfeit currency and was awaiting sentencing in July of 2008. The defendant offered to let the victim's mother and her two children stay with him until they found a permanent residence, and she accepted this offer. When she began staying with the defendant, she and the defendant slept on the couch, and her children slept in the front bedroom of the house.

The defendant was frequently around the victim and his brother, and he initially treated them well. However, around the beginning of July, the defendant's attitude toward the children began to change. He told the victim's mother that she "bab[ied]" her children too much and needed to discipline them. He said that the children "were too sensitive" and "whine[d] too much." He would say these things both to the victim's mother privately and in front of the children. He would insult the children, calling them "b****es and p***ies and say they were going to be f****ts when they grew up." The victim's mother recalled that during the time period right before the victim died, the name-calling "seemed to happen all the time." She would confront the defendant about his language, but she felt that at the time she did not "have too many other options" in terms of residency. Her mother and two sisters lived in Knoxville, but none of her relatives had room to take in both herself and her children on a permanent basis. Several of her friends and the victim's paternal grandmother would watch the children.

The defendant was "sometimes" alone with the children, but these periods were brief and occurred only when the victim's mother would "take a shower" or if she "had to run across the street to the store for something."

The week of July 18th, the victim's mother recalled that the victim had been behaving

as though he had a cold. While nothing appeared physically wrong with the victim, she observed that the victim, who was typically "full of energy," now only had "bursts of energy." The victim became tired "quicker than normal," would sleep for longer periods than normal, and did not display much of an appetite. The victim's mother gave the victim Tylenol, which seemed to dissipate the cold symptoms, but the victim still appeared "lethargic." Initially, she believed that the victim was simply "going through a growth spurt."

On July 18th, the victim's mother dropped her oldest son off at her mother's house and then went to see a movie with the defendant and the victim. After the movie, the three returned to the victim's mother's apartment, where the defendant sat on the porch while the victim played on the porch. The victim was within his mother's eyesight while he was on the porch, and she witnessed him fall while starting to walk down the porch steps. She went to check on the victim, and she observed that the skin on his back was slightly red but not broken. Later that evening, the victim's mother placed an ice pack on the victim. When a friend of hers visited the apartment to see the victim, the defendant went to the porch "and kind of had an attitude."

The victim's mother, the victim, and the defendant left her apartment and returned to the defendant's residence, where she prepared dinner. She placed the victim on the couch next to the defendant while she cooked. She prepared a plate for herself and one for the victim, and she sat down on the couch between the victim and the defendant. The defendant made a comment about the victim's mother "babying" the victim by giving him food off of her plate that caused her to lose her appetite. When the victim finished his dinner, he laid his head down on his mother's lap and fell asleep, and she soon fell asleep herself. The defendant was still on the couch when the victim and his mother went to sleep, and his mother recalled the defendant waking her up to tell her that he was taking the victim to the bedroom so that she could "stretch out" on the couch. The victim's mother assumed the defendant was taking the victim to the front bedroom, but she did not see the defendant after he walked around the couch. The victim appeared normal at this point, and she fell back asleep after the defendant exited the room with the victim.

Sometime later, the defendant woke the victim's mother and was holding the victim. The victim's mother could not remember exactly what time the defendant woke her or how long she had been asleep. She recalled that the victim appeared "limp" and that the defendant was asking her what was wrong with the victim because he was not breathing. The defendant was "hysterical," "pacing back and forth" and telling her "not to let [the victim] die." The victim's mother began questioning the defendant and asking what he had done because there was nothing wrong with the victim when the defendant took him. The victim was "gasping for air," and his eyes were "half open, but his pupils were dilated." She

3

felt the victim's chest and discovered that his "heart was beating so fast, but it wasn't strong." She breathed into the victim's mouth, believing that he may have been choking on something. When she saw the victim's chest fill with air, she realized that the victim was not choking.

The victim's mother used the defendant's phone to call her mother, who told her to call 911. She informed the defendant that they needed to take the victim to the hospital, and she called 911 from the defendant's vehicle while he drove to the hospital. During the ride to the hospital, the victim was "gasping" and his lips were "turning dry."

Dr. Robert Dickson was the treating physician in the emergency room when the victim was admitted to the hospital. Dr. Dickson testified that the victim arrived around 1:30 a.m. on July 19th in "in full cardiopulmonary arrest," which meant that the victim was not breathing and did not have a pulse or heart rate. The victim's pupils were fixed and dilated, which was a sign of severe neurologic injury. When the victim was first admitted, Dr. Dickson did not notice any visible signs of trauma on the victim's body. As Dr. Dickson continued to treat the victim, he noticed that "some bruising" began to appear, and he recalled that there was a large retinal hemorrhage in the victim's right eye. He testified that retinal hemorrhaging was often caused by trauma. Doctors performed a neurological exam, which revealed no neurological activity and that the victim was brain-dead. Dr. Dickson was not able to establish how the victim was injured, but he believed that the victim's prognosis was "bleak" based on his neurologic exam.

Debra Nuchols testified that she was an investigator in the family crimes unit of the Knoxville Police Department. She arrived at East Tennessee Children's Hospital around 4:30 or 4:45 a.m. on July 19th after receiving a call of suspected child abuse. Investigator Nuchols went to the victim's hospital room in the Intensive Care Unit ("ICU"), and she observed several "bruises or marks" visible on the victim's face. Shortly after she arrived, she contacted the crime lab to take photographs of the victim. She identified photographs of the injuries of the victim and confirmed that she was present when the photographs were taken.

The victim's mother and the defendant were in the hospital room with the victim after he was admitted, and the victim's mother recalled the defendant talking loudly. He would alternate between telling medical personnel to ensure that the victim was treated and telling the victim that "he can come out of it, he's going to be okay." The defendant paced around the room, appearing "frantic" and "panicked." Doctors transferred the victim to the ICU and informed his mother that the victim was brain-dead and needed to be placed on life support. After the victim was transported to the ICU, his mother left the hospital around 7:00 a.m. to return to her apartment to take a shower and change her clothes. The defendant drove her

4

to her apartment.

The victim's mother returned to the hospital later that morning, and the defendant was with her. Upon her return, she voluntarily spoke with the Department of Child Services ("DCS") and the Knoxville Police Department, who showed her photographs of bruises on the victim's body. She did not recognize the bruises or know how the victim became bruised. She stated that she did not hit the victim or cause the bruises. When she gave the victim a bath on the evening of July 18th, she did not observe any bruises on the victim's body. She recalled that he had a scratch above his eye that he received after crawling to retrieve a ball and a mark under his eye from hitting the corner of a table. She observed "a whole lot more marks" on the victim in the photographs than the two cuts above and below his eye. The last time that she saw the defendant, he was in the hospital room with herself and the victim. The defendant exited the room after the victim's godfather instructed him to leave.

Before he left the hospital, the defendant spoke with Investigator Nuchols. Investigator Nuchols recalled that the defendant "seemed very nervous, almost on edge." In his statement to Investigator Nuchols, the defendant said that he returned to his apartment with the victim and his mother around 10:00 p.m. on July 18th and that the three fell asleep on the couch about an hour later. Investigator Nuchols testified that the defendant told her that after the victim and his mother fell asleep, he took the victim to the bedroom to give her more room on the couch. He returned to the couch and received a page from a friend, and he went to pick up the victim. When he picked up the victim, the victim appeared "lifeless," and the defendant heard the victim making "some noise." The defendant went to wake the victim's mother and inform her that "there was something wrong with" the victim. The defendant did not offer an explanation for the victim's injuries, but he recalled seeing a small bruise on the victim earlier in the day, and he mentioned the incident where the victim fell down the stairs at his mother's apartment.

On cross-examination, Investigator Nuchols agreed that her written report of the defendant's statement did not say that the defendant took the victim to the bedroom and later picked him up off of the bed. She testified that her report stated that the defendant informed her that he picked the victim up from the couch after receiving a page from a friend.

Dr. Matthew Hill testified that he was assigned to the victim's case around 8:00 or 9:00 a.m. the morning of July 19th. Dr. Hill performed a neurological exam, which "showed no evidence of neuro[logical] function." At the time of the exam, the victim's body temperature had dropped to ninety-two degrees. The low body temperature indicated that the victim could not regulate his own body temperature, so doctors warmed his body over the course of the day in order to conduct a second neurological exam in the afternoon.

5

Dr. Hill also conducted a physical examination of the victim, and he testified that the exam revealed retinal hemorrhaging on the victim's eye. He stated that retinal hemorrhaging was "a sign of shaken baby or some sort of excessive trauma." He also observed that the victim began "putting out a lot of urine" around twelve or one p.m., which indicated that "the area of the brain that controls urine output was shut down."

Doctors were able to raise the victim's body temperature to a sufficient level to conduct a second neurological exam, and the victim did not respond to any of the tests. Doctors also conducted an apnea test to assess the victim's ability to breathe on his own. Doctors "preoxygenated" the victim and then removed him from the ventilator, recording the length of time that it took for the victim to breathe on his own. After the victim went seven minutes without taking a breath, doctors placed him back on the ventilator. Dr. Hill testified that the results of the apnea test indicated that the victim was legally brain dead.

Along with the second neurological test, doctors performed a second "head CT scan" in the afternoon. The victim had received an initial "head CT scan" when he arrived at the hospital "that was read essentially as normal." The second CT scan was performed about twelve hours later, and Dr. Hill testified that the scan "showed marked edema on the brain." Dr. Hill said that the second scan revealed swelling "everywhere" in the victim's brain, which indicated a "lack of oxygen and perfusion for an extended period of time." Dr. Hill stated that the test also revealed a "relatively small" subdural hematoma on the left side of the victim's brain.

Around 1:00 a.m. on the morning of July 20th, the victim began to show signs that he was not receiving an adequate flow of blood to his heart. The victim went into cardiac arrest, and doctors continuously applied epinephrine and CPR for "20-some-odd minutes," and they were unable to restore the victim's heart rate. His mother was in the hospital room while doctors attempted to resuscitate the victim. Dr. Hill told her that because neurological exams indicated that the victim was brain-dead, further efforts to resuscitate him were not likely to restore his brain function. He offered to stop the CPR treatments so that the victim's mother could hold the victim, and she indicated that she wished for the treatments to stop. The victim did not regain a heartbeat, and he was pronounced dead at 2:12 a.m. Dr. Hill stated that the likely cause of the victim's death was a brain injury, and he estimated that the degree of edema that the victim displayed indicated that he received his injuries ten to twelve hours before Dr. Hill arrived at the hospital.

The victim's mother attempted to contact the defendant to inform him that the victim had died and to tell him the date of the funeral. The defendant did not answer, and he did not attend the funeral. He contacted her later in the summer from a blocked phone number and told her that she needed "to keep [her] mouth shut, that [she] was trying to throw him under

6

the bus by telling people that he killed" the victim.

Dr. Mary Palmer testified as an expert in child abuse pediatrics. She stated that on July 19th, she received a call from Dr. Hill regarding the potential maltreatment of the victim. Upon hearing that while a CT scan of the victim's brain "had not shown anything remarkable," the victim was not showing any brain activity, Dr. Palmer posited that the victim may have been strangled. She believed strangulation may have been used to abuse the victim because it would have stopped the victim's heartbeat and normal brain function without directly causing an injury to the brain that would have been visible on the first CT scan.

Dr. Palmer examined the victim around 5:00 on the evening of July 19th. As part of her examination, Dr. Palmer attempted to view and document the bruises on the victim's body. Dr. Palmer used eight photographs taken while the victim was in the ICU to assist her in explaining the victim's injuries. The photographs showed the victim in his hospital bed, along with bruises on his neck, chin, jawline, lower back, buttocks, and leg. Although she did not take the photographs herself, Dr. Palmer testified that the photographs were an accurate depiction of the victim at the time he was in the ICU. She identified petechiae in the photographs of the bruises on the victim's neck, which she testified was consistent with choking. She agreed that the victim's injuries to his chin and jawline were consistent with choking. Dr. Palmer testified that the injuries were of the type where the bruising may not have been immediately apparent. She believed that because the color pattern of the bruises on the victim's lower back, buttocks, and leg were consistent, the injuries were inflicted at the same time as the injuries to his neck and jaw area as part of one episode of injury. Dr. Palmer estimated that the injuries had been inflicted within twenty-four hours of her examination of the victim. She testified that the bruises were not consistent with those that a child would receive during a normal course of play. She also testified that she believed that to a medical degree of certainty that blunt force trauma to the victim's body and strangulation caused the victim's injuries and that the injuries were not accidental.

Dr. Darinka Mileusnic-Polchan testified that she was the medical examiner who performed the autopsy on the victim. Thirty-one pictures from the autopsy were admitted into evidence. Dr. Mileusnic-Polchan testified that the photographs would be beneficial in explaining the victim's injuries to the jury, primarily because the victim suffered from multiple injuries that would be difficult to verbalize to the jury. She stated that the primary cause of the victim's death was strangulation and that blunt head trauma due to child abuse was a significant contributing condition in his death.

The defendant testified that he never had discussions with the victim's mother regarding her parenting and that he was never critical of her for "babying" her children. He

7

stated that he fell asleep on his couch on the evening of the incident with the victim and his mother. He awoke to the sound of his phone beeping, and the victim's mother was beside him on the couch with the victim in her lap. He picked the victim up and noticed that "he was breathing heavy, like something was wrong with him." He told the victim's mother to call 911, and she insisted that they take the victim to the hospital instead. He drove the victim to the hospital, and he recalled that the victim's mother was performing chest compressions on the victim as they drove. He testified that he never told Investigator Nuchols that he took the victim from the couch and placed him in the bedroom. He stated that he spoke with the victim's mother on the telephone after he left the hospital and that he saw her "random[ly]" a day after the victim's death.

At the conclusion of the trial, the jury found the defendant guilty as charged of felony murder committed in the perpetration of aggravated child abuse and of aggravated child abuse. The defendant filed a motion for new trial, which the trial court denied. He filed a timely notice of appeal, and we proceed to consider his claims.

## ANALYSIS

### I. Admission of Photographs

The defendant argues that the trial court erred in admitting photographs of the victim while he was alive in the hospital and photographs of the victim's autopsy. He contends that for some of the photographs, the prejudicial value outweighed the probative value and that others were not relevant to material issues at trial.

Tennessee courts follow "a policy of liberality" regarding the admission of photographs as evidence during a criminal trial. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). In order to admit the photographs, the trial court must first determine whether the photographs are relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. If the photograph is relevant, the trial court must next determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 951. "Unfair prejudice" is defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Adv. Comm. Note).

"Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and probative value is not outweighed

8

by their prejudicial effect." *State v. Brock*, 327 S.W.3d 645, 694 (Tenn. Crim. App. 2009). Autopsy photographs are not admissible "solely to inflame the jury and prejudice them against the defendant." *Banks*, 564 S.W.2d at 951. The photographs must be relevant to prove some part of the State's case. *Id.* "Photographs of a corpse are admissible in murder prosecutions if they are relevant to issues at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *State v. Derek Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011), *perm. app. denied* (Tenn. Dec. 14, 2011). The trial court possesses the sound discretion to determine the admissibility of photographs and will not be overturned on appeal absent a clear showing of an abuse of discretion. *Banks*, 564 S.W.2d at 949.

The State attempted to admit nine photographs of the victim depicting him while still alive in the hospital. The photographs showed the victim in his hospital bed connected to various tubes, along with various bruises on the victim's head, neck, jawline, back, and legs. After a jury-out hearing, the trial court ruled that eight of the photographs were admissible. The trial court excluded one photograph because it showed older bruising that may not have been inflicted during the abuse. In admitting the other eight photographs, the trial court found that their probative value substantially outweighed the danger of unfair prejudice, noting that the photographs depicted bruising that Dr. Palmer testified occurred during the time frame the State alleged that the abuse occurred. The court found that they would substantially assist the jury in determining the issues relevant to the cause of the injuries.

We conclude that the trial court properly admitted the photographs of the victim in the hospital. The photographs were probative of the nature and extent of the victim's injuries. Dr. Palmer testified that the bruises on the victim's neck, jawline, and head were indicative of strangulation and blunt force trauma, which she posited were the primary causes of the victim's death. She testified that the bruises on the victim's legs and backside shared the same coloration pattern, indicating that they were inflicted simultaneously with the injuries indicative of strangulation. She testified that the injuries were not accidental but were evidence of the infliction of intentional trauma. Dr. Palmer opined that all of the injuries were likely inflicted within a twenty-four hour period of her examination of the victim. The photographs were relevant to show that the injuries were intentionally inflicted during one continuous course of conduct, that they were not accidental injuries or incidental injuries inflicted during the course of treating the victim, and that several of these injuries ultimately caused the death of the victim. We conclude that the trial court did not abuse its discretion in admitting the photographs of the victim in the hospital.

The trial court also admitted twenty-one photographs of the victim's autopsy. The first photographs showed the victim's fully-clothed body and depicted his appearance at the

9

time of the autopsy. Subsequent photographs showed the various bruises on the victim's body. Dr. Mileusnic-Polchan testified that the primary cause of death was strangulation and that a contributing cause was blunt force trauma to the head. She stated that all of the injuries appeared to have been inflicted contemporaneously one to two days prior to the victim's death. She also testified that none of the injuries were of the kind received accidentally or during the normal course of play for a child. The final two photographs showed the interior of the victim's scalp and his brain and depicted extensive bruising of the brain. Dr. Mileusnic-Polchan testified that the exterior of the victim's scalp showed some bruising, but the bruises were somewhat obscured by the victim's hair. She stated that she did not discover the extent of the blunt force head trauma suffered by the victim until she examined his brain.

The trial court ruled that all of the autopsy photographs were admissible. The court found that they were not overly bloody or graphic, as they depicted bruises on the victim's body. The court found that the probative value substantially outweighed the danger of unfair prejudice. Because Dr. Mileusnic-Polchan testified that the injuries were inflicted contemporaneously and were not accidental, the court found that the photographs were beneficial in explaining the course of events that led to the victim's death and would "substantially assist the trier of fact" in the case.

We conclude that the trial court did not abuse its discretion in admitting the autopsy photographs. Similar to the hospital photographs, the autopsy photographs were probative of the nature and extent of the victim's injuries. They were relevant to show that all of the victim's injuries were inflicted within the same time period during the course of one continuing episode and to show that the injuries were not inflicted accidentally. Save for the photographs depicting the interior of the victim's scalp and brain, the photographs were not particularly bloody or gruesome. However, only two photographs of the brain were admitted, and they did not show the victim's face or any other identifying features. Further, they illustrated the blunt force head trauma that the victim suffered, the extent of which Dr. Mileusnic-Polchan testified was not visible when simply examining the exterior bruises on the victim's scalp. The defendant is not entitled to relief as to this claim.

## II. Cross-Examination of the Victim's Mother

The defendant contends that the trial court improperly limited his cross-examination of the victim's mother, which prevented him from effectively presenting a defense. Specifically, he argues that he should have been permitted to cross-examine her regarding the fact that she had given birth to a child who tested positive for opiates four years after the death of the victim. He also argues that pursuant to Tennessee Rules of Evidence 608 and 405, he should have been permitted to cross-examine the victim's mother about the fact that

10

she had initially been charged with aggravated child abuse and felony murder in conjunction with the victim's death. He further contends that he was denied the right to an effective cross-examination when the cumulative effect of the previous two alleged errors was coupled with the trial court's failure to adopt his special jury instruction that the victim's mother's felony conviction could be used to assess her credibility.

The Sixth Amendment to the United States Constitution affords a defendant the right to confront adverse witnesses. U.S. Const. amend. VI; *see also* Tenn. Const. art. I, § 9. This includes "the right to establish bias or to otherwise impeach the credibility of a witness." *State v. Echols*, 382 S.W.3d 266, 284-85 (Tenn. 2012) (citations omitted). The trial court possesses discretion over the propriety, scope, manner, and control of the examination of a witness. *State v. Harris*, 839 S.W.2d 54, 72 (Tenn. 1992). The trial court abuses this discretion only "by unreasonably restricting a defendant's right to cross-examine a witness against him." *Echols*, 382 S.W.3d at 285.

Both "[t]he Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000). However, this right to present witnesses is not absolute. *Id.* Instead, "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). In order to determine whether the exclusion of evidence violated a defendant's right to present a defense, courts "should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting the exclusion of evidence is substantially important." *Brown*, 29 S.W.3d at 433-34.

### A. Birth of Child

Prior to trial, the State filed a motion in limine to prohibit the defendant from cross-examining the victim's mother about the fact that she gave birth to a child who tested positive for opiates. The trial court properly conducted an *in camera* review of the DCS file of the mother and her child. *See State v. Middlebrooks*, 840 S.W.2d 317, 333 (Tenn. 1992) (stating that trial court erred in denying defendant access to confidential medical records without first conducting an *in camera* review "to determine what, if any, probative information they contained."), *superseded by statute as stated in State v. Pruitt*, 415 S.W.3d 180 (Tenn. 2013). After conducting the review, the trial court denied the defendant access to the victim's mother's confidential file. The court found that the allegations were "unfounded" and that the file did not contain "any evidence that could be deemed

11

exculpatory or relevant."

Having reviewed the records, we conclude that the restriction of the cross-examination of the victim's mother did not violate the defendant's right to present a defense. The DCS records indicated that there was an open file on the victim's mother and that she gave birth to a child who tested positive for opiates, which may have resulted from prescription drugs that the victim's mother was taking during the pregnancy. The case was closed as "unfounded" because the victim's mother had valid prescriptions for the medication and received sufficient prenatal care. Contrary to the defendant's contention, the records do not contain evidence that the victim's mother committed child abuse, and they were neither exculpatory nor relevant to attack the credibility of the victim's mother. Therefore, the evidence was not critical to the defense. *See Brown*, 29 S.W.3d at 434. We conclude that the trial court did not abuse its discretion in excluding the evidence of the DCS file, and the defendant is not entitled to any relief.

### B. Dismissed Charges

The State also filed a motion in limine to prevent the defendant from cross-examining the victim's mother about the fact that she was initially charged with the same crimes as the defendant. The State argued that the charges against the victim's mother were dismissed by a former prosecutor and were not dismissed in exchange for her testimony at trial. The State included a transcript of the colloquy between the prosecutor and the trial judge where the charges were dismissed as an exhibit to the motion.

During the colloquy, the prosecutor explained that the victim's mother was initially charged under a theory that the victim had prior injuries that would have been obvious to his mother and under the theory that she had failed to take adequate steps to protect the victim. As the investigation continued, prosecutors learned that due to the nature of the victim's injuries, they may not have been readily apparent to his mother. After willingly submitting to a third police interview, an interview with the prosecutor, and a polygraph test, the prosecutor "became pretty convinced" that the victim's mother had no knowledge of the victim's injuries that would cause her to be guilty of neglect. The prosecutor explicitly stated that the charges were not being dropped against the victim's mother in exchange for her testimony at trial.

In a written order, the trial court prohibited the defense from referencing the fact that the charges against the victim's mother were dismissed until after her testimony. The order further stated that the court would rule after her direct examination whether the defendant could address the dropped charges on cross-examination. At the conclusion of the victim's direct examination, the defendant did not raise the issue, and he did not attempt to cross-

examine her about the dismissed charges. He now argues that the evidence should have been permitted during cross-examination pursuant to Tennessee Rules of Evidence 608 and 405 and that the exclusion of the evidence prevented him from establishing his theory that the victim's mother may have been responsible for the abuse.

We conclude that the defendant has waived this issue. The trial court explicitly reserved its ruling regarding cross-examination until the conclusion of the victim's mother's direct testimony. After her direct examination, the defendant did not ask the court to rule on the State's motion or attempt to cross-examine the victim's mother about the dismissed charges. Because the defendant did not ask the trial court to rule on the admissibility of the testimony and did not attempt to introduce the testimony, the issue is waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Gary Thomas Reed*, No. E2009-02238-CCA-R3-CD, 2011 WL 1842711, at *8-9 (Tenn. Crim. App. May 12, 2011) (concluding that a defendant arguing that the prohibition of testimony regarding a co-defendant's guilty plea deprived him of his right to present a defense had waived the issue when he did not attempt to elicit the information at trial or request a definitive ruling on the record as the trial court instructed), *perm. app. denied* (Tenn. Aug. 24, 2011). The defendant has not asked this court to review the issue for plain error, and we do not discern a basis for plain error review given the facts of this case. The defendant is not entitled to any relief.

## C. Jury Instruction

The defendant argues that the failure to charge the jury with his proposed special instruction regarding the use of the victim's mother's felony conviction to assess her credibility had the cumulative effect of depriving him of his right to an effective cross-examination when coupled with the limitations on cross-examination. This section of the brief does not contain any citations to the record or to any authorities. Therefore, this issue is waived. *See* Tenn. Ct. Crim. App. R. 10(b) (stating that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court"). The defendant is not entitled to any relief as to this claim.

## III. Election

The defendant argues that the State was required to make an election as to which specific injury constituted aggravated child abuse and felony murder based upon aggravated child abuse. He claims that the failure to elect between the different injuries resulted in "a grab-bag verdict," of which the unanimity was in question.

The doctrine of election requires the State to elect a set of facts when it charges a defendant with one offense, but there is evidence of multiple offenses. *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999). This doctrine is applied to ensure that the defendant can prepare for the specific charge, to protect the defendant from double jeopardy, and to allow an appellate court to review the legal sufficiency of the evidence. *Id.* Most importantly, election ensures that some jurors do not convict the defendant of one offense and other jurors of another. *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993).

Here, the State alleged that the aggravated child abuse and felony murder occurred as the result of a continuing course of conduct. The proof at trial reflected that the multiple injuries were part of a single criminal episode rather than separate, discrete events. "When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises." *State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). In a factually similar case, this court concluded that the State was not required to make an election of offenses when the proof indicated that the victim suffered multiple injuries inflicted during one criminal episode. *State v. Aaricka Biley*, No. W2012-00414-CCA-R3-CD, 2013 WL 3131002, at *7 (Tenn. Crim. App. June 14, 2013), *perm. app. denied* (Tenn. Oct. 16, 2013). In *Aaricka Biley*, the defendant was charged with one count of aggravated child abuse committed during a five-day period. *Id.* The State presented evidence of multiple injuries, and the majority of the proof indicated that the injuries occurred during one criminal event the evening before the victim's hospitalization. Because the State indicated that the injuries were part of a single criminal episode, the defendant "was aware of the acts upon which the State relied to support the charge for aggravated child abuse," and there was no need for an election of offenses. *Id.* Similarly to *Aaricka Biley*, the proof here established that the multiple injuries that the victim suffered were inflicted during one criminal event. Therefore, we conclude that the State was not required to make an election of offenses. The defendant is not entitled to any relief as to this claim.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

14